## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANGEL LOPEZ,<br>    Plaintiff,<br><br>    v.<br><br>CONNECTICUT BASEMENT SYSTEMS,<br>INC.,<br>    Defendant. | No. 3:12-cv-01211 (JAM) |

### RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Angel Lopez worked at defendant company Connecticut Basement Systems, Inc., where he was a foreman in charge of small work crews that waterproofed basements. One day in November 2010, he received a text message from his supervisor referring to a "f***ing p.r." (asterisks substituted). Although the supervisor did not intend to send the message to plaintiff, plaintiff was offended because he reasonably believed the message was complaining about him and referred to his Puerto Rican ethnicity. He complained to the supervisor and eventually to the company's president about the offensive text message. Several weeks later, plaintiff was injured on the job and was no longer able to work. He no longer works for defendant.

Plaintiff filed suit in 2012 under Title VII of the Civil Rights Act of 1964 and the Connecticut Fair Employment Practices Act alleging that he was subject to discrimination on the basis of his Puerto Rican ethnicity and to retaliation on the basis of his complaints about the offensive text message. He also claims that he was subject to a hostile work environment because of his ethnicity.[1] Defendant has now moved for summary judgment (Doc. #40), and I will grant

---

[1] Plaintiff initially brought an additional state law claim of intentional infliction of emotional distress, which was dismissed by the Court (*Arterton, J.*) on April 5, 2013. *See* Doc. #22.

the motion because plaintiff has fallen well short of showing genuine issues of fact that remain for a jury to consider at trial.

BACKGROUND

Plaintiff began work for defendant Connecticut Basement Systems (CBS) in about 2003. *See* Doc. #1 at 2. CBS performs residential basement waterproofing and finishing. Each waterproofing job is completed by a small crew of workers, including a foreman. Basement waterproofing is a seasonal enterprise, and business fluctuates depending on the weather.

On November 10, 2010, plaintiff ran into car trouble while driving to a job. He called his supervisor, Allan Guglielmoni, to ask for assistance and received an angry response. While plaintiff waited at a gas station for a mechanic, he received a text message from Guglielmoni that was intended for someone else. *See* Doc. #41-5 at 6, ¶ 22. The message read, "So what happening with this f***ing p.r." *Ibid.* (asterisks substituted). Plaintiff was very upset about the text message and believed that it was disrespectfully referring to him based on his Puerto Rican ethnicity. Later, either the same day or the following day, plaintiff approached Guglielmoni to discuss the message. Guglielmoni apologized and told him that the message was not intended for him.

Plaintiff was not satisfied with Guglielmoni's apology, and wanted to report the incident to Lawrence Janesky, the company owner and president. When he approached Janesky's secretary, Kiesha Lewis, plaintiff says she tried to dissuade him from reporting the incident, warning that if he did, plaintiff would be laid off and Guglielmoni would not face any consequences. Plaintiff hesitated, but a couple of days later, he took advantage of Janesky's "open door policy" and called to tell him about the text message incident. Doc. #49 at 17. Plaintiff alleges that Janesky's response was to laugh and say, "Good!" Doc. #49-1 at 8. But after

2

that conversation, Janesky approached Guglielmoni to discuss the incident, and Guglielmoni explained to Janesky that he did not intend for plaintiff to receive the text message. Janesky issued Guglielmoni a verbal warning against sending similar messages, and advised Guglielmoni to treat company employees with respect.

According to plaintiff, he was subject to adverse employment action following the text message of November 10 and his complaints to his supervisor and the company president. He alleges that his work team was subsequently reduced from a three-man crew to a two-man crew and that he was paid less for the work that he did. At the end of December 2010, plaintiff suffered a workplace injury and had to stop working. He received worker's compensation payments and ultimately settled his worker's compensation claim with the company.

In May 2011, plaintiff filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities. In August 2012, he filed this suit in federal court under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.*, claiming that he was subject to a hostile work environment and disparate treatment on the basis of his ethnicity, and that the company retaliated against him for bringing an internal complaint of discrimination.

### DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Zann*

*Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480

F.3d 140, 145 (2d Cir. 2007)). The evidence adduced at the summary judgment stage must be

viewed in the light most favorable to the non-moving party and with all ambiguities and

reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866;

*Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's

function' at summary judgment is not 'to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866

(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

### *Disparate Treatment and Retaliation*

Plaintiff alleges that defendant cut his pay and reduced the size of his work crew because

of his Puerto Rican heritage and because he complained about the text message he received from

Guglielmoni. Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to

discriminate because of an employee's national origin, including the national origin of an

employee's ancestors or family members. 42 U.S.C. § 2000e-2(a)(1); 29 C.F.R. § 1606.1;

*Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). Connecticut's cognate anti-discrimination

law, the Connecticut Fair Employment Practices Act (CFEPA), similarly prohibits discrimination

based on national origin or ancestry. *See* Conn. Gen. Stat. § 46a-60(a)(1). Both laws also prohibit

discrimination against an employee because he "opposed any [unlawfully discriminatory]

practice" or "made a charge, testified, assisted, or participated in" a discrimination proceeding or

investigation. 42 U.S.C. § 2000e–3(a); Conn. Gen. Stat. § 46a-60(a)(4); *Burlington N. & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (hereinafter *Burlington Northern*).

Plaintiff's federal and state law claims are governed alike by the familiar *McDonnell*

*Douglas* burden-shifting framework and subject to the same analysis. *See Kaytor v. Elec. Boat*

4

*Corp.*, 609 F.3d 537, 556 (2d Cir. 2010); *Craine v. Trinity Coll.*, 259 Conn. 625, 636–37 & 637 n.6, 791 A.2d 518 (2002); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Accordingly, for his discrimination claim, plaintiff must present a *prima facie* case by demonstrating (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Tolbert v. Smith*, __ F.3d __, 2015 WL 3875237, at *5 (2d Cir. 2015) (citation omitted). Similarly, for his retaliation claim, plaintiff must show (1) that he participated in a protected activity known to the defendant; (2) that the defendant took an employment action disadvantaging him; and (3) that there exists a causal connection between the protected activity and the adverse action. *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 257 (2d Cir. 2014) (citation omitted).

If plaintiff succeeds in making this *prima facie* showing, then "the burden shifts to the defendant, which is required to offer a legitimate, non-discriminatory rationale for its actions." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (internal quotation marks and citation omitted); *see also Abrams*, 764 F.3d at 254. If defendant meets that burden, plaintiff in turn must prove that the employer's stated reason was a pretext for discrimination or retaliation. *See Abrams*, 764 F.3d at 254; *Aulicino*, 580 F.3d at 80. Plaintiff can only meet his burden if he shows both that the employer's stated reason is untrue or incomplete, and either that racial discrimination was a motivating factor in the adverse action, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000); *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 157 (2d Cir. 2010), or, in the case of a retaliation claim, that the action would not have occurred but for a retaliatory motive, *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517,

2533 (2013); *Zann Kwan*, 737 F.3d at 845–46.

Here, I conclude that plaintiff has failed to establish even a *prima facie* case for discrimination or retaliation. Plaintiff indicated at oral argument that he primarily challenges the reductions in his commission rate and his crew size. But he has not demonstrated that these actions were objectively adverse. In the context of a disparate treatment claim, an adverse employment action is "a 'materially adverse change' in the terms and conditions of employment." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004) (citation omitted). It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (Sotomayor, J.) (citation omitted). Moreover, "the fact that the employee views the [action] either positively or negatively does not of itself render [it] [an] adverse employment action." *Ibid.* (internal quotation marks and citation omitted) (some alterations in original).

The standard for a retaliation claim is slightly different. There, an adverse action need only have a tendency to "'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 174 (2011) (quoting *Burlington Northern*, 548 U.S. at 53). But "[m]aterial adversity is to be determined objectively, based on the reactions of a reasonable employee," and "some actions may take on more or less significance depending on the context." *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 (2d Cir. 2011) (quoting *Burlington Northern*, 548 U.S. at 69–70).

Plaintiff has not demonstrated that the reduction in crew size satisfies either standard. Plaintiff testified in his deposition that a smaller crew required him to personally do more work on each job. But the record shows—and plaintiff does not dispute—that as a foreman, his bonus on each job increased as his crew size decreased. The commission on each contract was reduced,

in part, by the other workers' wages, and plaintiff received the remainder. So although plaintiff may have had more work with fewer helpers, he also saw a commensurate pay increase. This was simply a trade-off and a shift in job responsibilities.

The evidence does not show a triable issue concerning any connection between plaintiff's work crew reduction and his internal discrimination complaint. Although plaintiff alleges that his work crew was reduced from three men to two men following his November complaints, his paystubs, whose contents he does not dispute, *see* Doc. #49-2 at 80, 82, tell a different story. They indicate that plaintiff oversaw two-man crews on many days prior to his complaint, *see, e.g.*, Doc. #41-4 at 15 (two-man crew during week of November 6, 2010); *id.* at 16 (two-man crew during week of Oct. 30, 2010); *id.* at 17 (two-man crew during week of Oct. 23, 2010); and that he had a three-man crew on one day after the complaint, *see* Doc. #41-4 at 13 (three-man crew on Saturday, November 20, 2010).

Likewise, plaintiff has fallen well short of establishing a triable fact issue that he was paid less as a result of any discriminatory or retaliatory animus. The record includes plaintiff's weekly pay records from the week of September 4, 2010, to the week of December 18, 2010 (after which he was injured and no longer able to work). Doc. #41-4 at 7–24. These records show that plaintiff's commission rate remained steady at 9.25% for all of September, October, November, and through the week of December 4, 2010—continuing at the same rate for approximately one month *after* the troubling text message of November 10.[2] For the week of December 10, 2010, the commission rate decreased slightly to 8.38%, but then for the following

---

[2] The sole exception is for the week of September 4, 2010, when plaintiff received a commission rate of 16.75% for one of the jobs that he worked. Doc. #41-4 at 24.

week of December 18, 2010, the commission rate *increased* to an average rate of 10.05%.[3]

Nor do the weekly pay records suggest any discernible pattern of decrease in plaintiff's work hours or total weekly take-home pay. Plaintiff's weekly earnings in 2010 averaged $1,309.90. *See* Doc. #41-4 at 7. His average weekly pay for the four work weeks in November 2010 was $1,328.55, and his average weekly pay for the three weeks that he worked in December was $1,487.68. *See ibid.* In short, the pay records show that plaintiff's pay *increased* in the weeks following the text message of November 10. And these pay records conclusively refute plaintiff's claim that his pay was docked for discriminatory or retaliatory reasons.[4]

Even if I were to assume without deciding that plaintiff had established a *prima facie* case, in view of his slight burden at this stage, *see Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012), defendant has articulated non-discriminatory reasons for its actions. Janesky stated that the basement waterproofing business fluctuates with the weather, and business is limited in the winter months. Accordingly, "[i]t was also not unusual for the company to reduce installation crews from two laborers to one laborer," to "cut[ ] back production during the winter," and "reduce the workweek to four days per week" so that the company had enough work to carry them through the season. Doc. #41-1 at 7. That way, the company could avoid layoffs and keep workers on the payroll. And although Janesky did not articulate the precise rationale behind the change in plaintiff's commission rate, he did point out that, to the extent the reduced crew had any effect on plaintiff's take-home pay, the net effect

---

[3] During the week of December 18, the commission rate for each of plaintiff's job projects was 8.38% except for one large project for which it was doubled to 16.75%. With a total contract price of $17,541 and total commission payments of $1,763.14 (equivalent to the total commissions paid on the contract price for each job, and not including uncategorized additional payments made directly to plaintiff of $10 and $25) this works out to a total average commission rate of 10.05%. *See* Doc. #41-4 at 9.

[4] Nor is there any support in the pay records for plaintiff's claim made during his deposition and reiterated in his briefing that his commission rate "was reduced from 9 percent to 6.38 percent after he made his complaints to the defendant about the discriminatory conduct." Doc. #49-1 at 8.

8

was positive, as I discussed above.

Plaintiff struggles to rebut defendant's justification by showing that it is pretext for ethnic discrimination or retaliation. He first brings conclusory allegations that workers of other ethnicities did not suffer the same commission rate reduction. But although it is fair game for plaintiff to rely on comparator evidence, *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 494 (2d Cir. 2010), he provides no admissible evidence to support his belief. When asked during his deposition how plaintiff knows the commission rates of the other foremen, he responded, "They talk about it." Doc. #49-2 at 92. This assertion is inadmissible hearsay. *See* Fed. R. Evid. 801(c), 802; *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment . . . ." (internal quotation marks and citation omitted)).

Plaintiff also attempts to connect defendant's actions to what he sees as an environment hostile to Puerto Ricans. But he stated repeatedly during his deposition that aside from the derogatory text message, he was treated no differently at the company because he was Puerto Rican. *See, e.g.*, Doc. #49-2 at 54, 74. Plaintiff presented no evidence that his Puerto Rican heritage motivated Keisha Lynch's warning that plaintiff might be laid off, or Janesky's response to plaintiff's discrimination complaint. And although Guglielmoni's text message contains a derogative reference to plaintiff's ethnicity, and neither party disputes its impropriety, that single incident does not illustrate a discriminatory environment. As the Second Circuit has recently noted, "the more remote and oblique [derogatory] remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tolbert*, 2015 WL 3875237, at *7 (quoting *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007) (citing cases and discussing examples)).

Even assuming, as plaintiff alleges, that Guglielmoni had previously threatened Puerto Rican workers, "disrespect[ed] all the Puerto Ricans," "talk[ed] crap" about the Puerto Ricans, and laid off Puerto Ricans at the exclusion of workers of other ethnicities, Doc. #49-2 at 53–54, plaintiff points to no evidence that Guglielmoni targeted those workers *because of* their ethnicity. Indeed, a discrimination claim requires more than just evidence that an employee was treated differently from his co-workers—it requires proof that the differential treatment was motivated by his protected trait or status. *See Nassar*, 133 S. Ct. at 2525 (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)). When plaintiff was asked during his deposition what led him to believe that Guglielmoni's actions were motivated by ethnic bias, plaintiff could offer no explanation except to say that the Puerto Rican workers were "like brothers . . . like family related." *See* Doc. #49-2 at 54. To the contrary, when he was asked whether CBS "is a place where people get measured by how well they work as opposed to where they're from," plaintiff responded, "If you work hard, they keep you; if you work slow, they fire you." Doc. #49-2 at 40–41.

In addition, even Keisha Lynch's warning that plaintiff could be laid off if he complained to Janesky about discrimination would not persuade a reasonable juror that defendant's explanations were pretextual. Why? Because plaintiff was not subsequently laid off—he continued to work until he was injured and unable to work. Nor is there any evidence that Lynch played any role in determining plaintiff's commission rate or work crew size. Her subjective belief that plaintiff would face consequences is not enough to persuade a reasonable jury. *See Tolbert*, 2015 WL 3875237, at *7.

In short, the evidence does not show a triable issue of fact of discrimination or retaliation under the *McDonnell Douglas* framework. Accordingly I grant defendant's motion for summary

10

judgment on plaintiff's claims of disparate treatment and retaliation.

### *Hostile Work Environment*

Plaintiff also claims that he was subject to a hostile work environment on account of his Puerto Rican origin. For Title VII and CFEPA claims, a hostile work environment exists if (1) "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 203 (2d Cir. 2014) (quoting *Mack v. Otis Elevator Co.*, 326 F.3d 116, 122 (2d Cir. 2003)), and (2) "the discriminatory conduct may be imputed to the employer." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 153 (2d Cir. 2014); *see also Brittell v. Dep't of Correction*, 247 Conn. 148, 165–69, 717 A.2d 1254 (1998) (analyzing CFEPA hostile work environment claim using Title VII principles).

Relevant factors include "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Desardouin v. City of Rochester*, 708 F.3d 102, 105 (2d Cir. 2013) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Moreover, a hostile work environment claim requires more than just a hostile work environment—it requires proof that hostile acts "'occur[ed] because of an employee's . . . *protected characteristic*, such as . . . national origin," rather than other reasons. *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014). That is because anti-discrimination laws protect against status-based discrimination and are not otherwise "'a general civility code for the American workplace.'" *Redd v. New York Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (quoting *Burlington Northern*, 548 U.S. at 68).

11

Although plaintiff's allegations have been rather vague regarding the components of his claim, he focuses his attention on Guglielmoni's text message and the company's response. And even if he intends to draw in other allegedly harassing incidents, I discount that attempt based on plaintiff's own deposition testimony that he suffered no maltreatment based on his ethnicity before the text message incident. *See* Doc. #49-2 at 54, 74.

In any event, even the text message falls below the standard for proving a hostile work environment. "For racist comments, slurs, and jokes to constitute a hostile work environment, . . . there must be more than a few isolated incidents of racial enmity." *Aulicino*, 580 F.3d at 83 (internal quotation marks and citations omitted). The single text message, which the parties agree was sent to plaintiff by mistake, does not reach that bar. I must consider "the quantity, frequency, and severity of th[e] slurs [at issue] . . . in order to obtain a realistic view of the work environment." *Ibid.* Because the text message was sent to plaintiff by mistake, it was not directed at insulting him to his face. Indeed, plaintiff testified at his deposition that it was not uncommon for CBS workmen to refer to each other not by name, but by nationality, including "Puerto Rican," and that he did not find that usage to be offensive. *See* Doc. #49-2 at 39–40.

For summary judgment purposes, I must also credit plaintiff's claim that Janesky smiled and said "Good" when plaintiff complained about the text message to him. But it is also undisputed that Janesky had an "open door" complaint policy and that he took prompt corrective action by discussing the text message incident with Guglielmoni and issuing him a verbal warning. *See Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108, 111 (2d Cir. 2007) (finding no harassment or retaliation where "the supervisors at UPS took plaintiff's complaints seriously, corrected the improper comments on the part of [a supervisor], and transferred her to other locations when she requested a transfer."); *cf. Petrosino v. Bell Atl.*, 385 F.3d 210, 226 (2d Cir.

2004) (finding that an issue of material fact existed regarding whether employer "investigated her complaint or took any remedial action" after employee's call to complaint hotline).

There is no evidence that any hostile acts took place within the limitations period, before or after the offensive text message. *See Diggs v. Town of Manchester*, 303 F. Supp. 2d 163, 181 (D. Conn. 2004) (noting that "vague statements of discrimination" do not create a triable issue of fact regarding a hostile work environment); *see also Demaio v. Connecticut Dep't of Correction*, 2012 WL 892933, at *8 (D. Conn. 2012) (plaintiff's allegations of harassment could not survive summary judgment "without identification of the perpetrators or more detail about the incident or incidents"). In view of the demanding standard required to establish a hostile work environment, the offensive text message and Janesky's initial response to plaintiff's complaint do not suffice to establish a triable issue of fact of a hostile work environment.

## CONCLUSION

No genuine issue of fact remains to support plaintiff's claims of discrimination, retaliation, and a hostile work environment. Accordingly, defendant's motion for summary judgment (Doc. #40) is GRANTED. The Clerk of Court shall close this case.

It is so ordered.

Dated at Bridgeport this 29th day of July 2015.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge